# No. 22-2763

IN THE

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

AMY COOPER,

*Plaintiff–Appellant,*

*v.*

FRANKLIN TEMPLETON INVESTMENTS, FRANKLIN RE-SOURCES, INC., JENNY JOHNSON, FRANKLIN TEMPLE-TON COMPANIES, LLC, FRANKLIN TEMPLETON,

*Defendants–Appellees,*

Franklin Templeton Corps. XYZ 110, John Does, Jane Does 1–10,

*Defendants.*

On appeal from the
United States District Court for the Southern District of New York,
Hon. Ronnie Abrams, Case No. 21-cv-4692

## APPELLEES' BRIEF

Bryan Killian
Grace E. Speights
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004
T: 202-739-3000
bryan.killian@morganlewis.com
grace.speights@morganlewis.com

i

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellees state that Franklin Templeton Companies, LLC is a limited liability company and that its sole member is Templeton Worldwide, Inc. Templeton Worldwide, Inc. is a wholly-owned subsidiary of Legg Mason, Inc., which is a wholly-owned subsidiary of Franklin Resources, Inc. Franklin Resources, Inc. is a publicly held corporation that has no parent corporation, and no public corporation owns 10% or more of Franklin Resources, Inc.'s stock.

"Franklin Templeton" and "Franklin Templeton Investments" are brand names and are not legal entities capable of being sued.

# TABLE OF CONTENTS

Page

Corporate Disclosure Statement ................................................................. i

Questions Presented ................................................................................. 1

Statement of the Case ............................................................................... 2

I.   A viral video captures Ms. Cooper's encounter with Mr. Cooper in Central Park. .................................................................. 3

II.  The company responds to the video. ............................................ 6

III. The district court dismisses Ms. Cooper's suit against Appellees. .................................................................................... 9

Summary of Argument ............................................................................. 11

Argument .............................................................................................. 14

I.   Standard of Review .................................................................... 14

II.  Ms. Cooper pleaded an invalid defamation claim. ...................... 14

     A.  Appellees' statements are nonactionable opinions, not actionable mixed opinions. .................................................. 15

     B.  Ms. Cooper fails to allege actual malice. .......................... 29

III. Ms. Cooper failed to plead discrimination claims. ..................... 33

     A.  Racism is not race. ........................................................... 34

     B.  The individuals Ms. Cooper compares herself with are not similarly situated to her. ............................................. 35

Conclusion ............................................................................................ 43

Certificate of Compliance ....................................................................... 44

Certificate of Service .............................................................................. 45

# Table of Authorities

Page(s)

**CASES**

*Anderson v. N.Y. City Dep't of Fin.*,
    2021 WL 168476 (S.D.N.Y. Jan. 19, 2021)...................................................39

*Biro v. Conde Nast*,
    807 F.3d 541 (2d Cir. 2015)................................................. 14, 31, 32, 34

*Bliss v. MXK Rest. Corp.*,
    220 F. Supp. 3d 419 (S.D.N.Y. 2016) ............................................34

*Brian v. Richardson*,
    87 N.Y.2d 46 (1995) .................................................................15

*Celle v. Filipino Reporter Enters., Inc.*,
    209 F.3d 163 (2d Cir. 2000)........................................................14

*Chau v. Lewis*,
    771 F.3d 118 (2d Cir. 2014)................................................14, 15, 18, 22

*Cummings v. City of N.Y.*,
    2020 WL 882335 (S.D.N.Y. Feb. 24, 2020)................................................18

*De La Pena v. Metro. Life Ins. Co.*,
    552 F. App'x 98 (2d Cir. 2014) ....................................................43

*De La Pena v. Metro. Life Ins. Co.*,
    953 F. Supp. 2d 393 (E.D.N.Y. 2013)................................................43

*Doe #1 v. Syracuse Univ.*,
    468 F. Supp. 3d 489 (N.D.N.Y. 2020) ............................................18

*Graham v. Long Island R.R.*,
    230 F.3d 34 (2d Cir. 2000)....................................................... 36, 42

*Gross v. N.Y. Times Co.*,
    82 N.Y.2d 146 (1993)................................................................15

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989)................................................................. 32, 33

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Secs. Litig.*,
  289 F. Supp. 2d 429 (S.D.N.Y. 2003) ........................................27

*Jaszai v. Christie's*,
  279 A.D.2d 186, 719 N.Y.S.2d 235 (1st Dep't 2001) ...............18, 22, 29

*Johnson v. Andy Frain Servs., Inc.*,
  638 F. App'x 68 (2d Cir. 2016)............................................. 34, 43

*Konikoff v. Prudential Ins. Co. of Am.*,
  234 F.3d 92 (2d Cir. 2000).........................................................32

*Levin v. McPhee*,
  119 F.3d 189 (2d Cir. 1997).......................................................14

*Littlejohn v. City of New York*,
  795 F.3d 297 (2d Cir. 2015).......................................................39

*Mandell v. Cty. of Suffolk*,
  316 F.3d 368 (2d Cir. 2003).......................................................36

*Maraschiello v. City of Buffalo Police Dep't*,
  709 F.3d 87 (2d Cir. 2013).........................................................35

*Marcus v. Leviton Mfg. Co., Inc.*,
  661 F. App'x 29 (2d Cir. 2016)...................................................43

*Masson v. New Yorker Magazine, Inc.*,
  501 U.S. 496 (1991)...................................................................32

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964)...................................................................31

*Pippen v. NBCUniversal Media, LLC*,
  734 F.3d 610 (7th Cir. 2013) .....................................................33

*Rand v. New York Times Co.*,
  75 A.D.2d 417, 430 N.Y.S.2d 271 (1st Dep't 1980).....................20

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
  42 N.Y.2d 369 (1977)..................................................................................15

*St. Amant v. Thompson*,
  390 U.S. 727 (1968).............................................................................. 32, 33

*Steinhilber v. Alphonse*,
  68 N.Y.2d 283 (1986)........................................................................... 18, 19

*Trustco Bank of New York v. Cap. Newspaper Div. of Hearst Corp.*,
  213 A.D.2d 940, 624 N.Y.S.2d 291 (3d Dep't 1995)...............................24

*Williams v. Metro-N. R.R.*,
  2020 WL 1489832 (S.D.N.Y. Mar. 27, 2020) .............................................39

**STATUTES**

42 U.S.C. § 1981 ...........................................................................................1, 9

N.Y. Civil Rights Law § 76-a(2)............................................................... 30, 31

NYCHRL..................................................................................... 1, 10, 34

NYSHRL...................................................................................... 1, 10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(6) ...............................................................................14

Fed. R. Civ. P. 12(d) ....................................................................................28

*Restatement (Second) of Torts* § 566, cmt. c (1977) .....................................20

Robert D. Sack, *Sack on Defamation*, § 4:4:2 (4th ed. 2012)......................20

# QUESTIONS PRESENTED

1. Whether three statements Ms. Cooper deems defamatory are merely unactionable statements of opinion about her behavior recorded in a video that was widely watched and commented upon before the challenged statements were made.

2. Whether Ms. Cooper failed to allege facts demonstrating that any of the alleged defamatory statements was made with actual malice.

3. Whether the district court correctly held that Ms. Cooper failed to state employment-discrimination claims under Section 1981 (race only), the NYSHRL (race and sex), and the NYCHRL (race and sex).

# STATEMENT OF THE CASE

Amy Cooper was employed by a company affiliated with Appellees until the day after she was videorecorded in Central Park, warning an African-American man that, if he did not stop recording her, she would call the police and "tell them there's an African-American man threatening my life." Within hours, the video of Ms. Cooper's encounter with the man and her 911 call went viral. The public reacted forcefully to the video; the media covered it extensively; and Ms. Cooper publicly apologized. It was, she confesses, a "racial flashpoint" and "international news." App. 11 (Compl. ¶ 1).

While all this was happening, Appellees issued two statements—one the night of the encounter, the other the next day—expressing that they neither tolerate nor condone "racism of any kind." After watching the video, speaking with Ms. Cooper, and seeing the man's public account and her public apology, Appellees decided to terminate her. Over the following month, reporters asked Appellees about the incident, and Appellees reiterated their "zero tolerance for racism" while standing by the decision to terminate Ms. Cooper.

Ms. Cooper responded by suing Appellees for defamation and discrimination on the basis of her race and sex. In a thorough decision, the

district court held that Ms. Cooper failed to state claims for relief. Appellees' statements are unactionable opinions. And Appellees' swift decision to terminate Ms. Cooper because of her conduct caught on video was not an unlawful employment decision based on her race or sex.

Racism of any kind is wrong. As New York courts have long held, statements condemning racism are nonactionable opinions. And as this Court has long held, firing employees because of racism is not the same thing as firing employees because of their race. The district court rightly determined that Ms. Cooper's Amended Complaint is fundamentally inconsistent with these settled principles. The order dismissing Ms. Cooper's claims should therefore be affirmed.

## I. A viral video captures Ms. Cooper's encounter with Mr. Cooper in Central Park.

May 25, 2020 was the first Memorial Day during the COVID-19 pandemic. It also was the day of the events that give rise to this case.

That morning, Amy Cooper, a White woman, was walking her dog in Central Park. Christian Cooper, an African-American man unrelated to Ms. Cooper, was watching birds in the same place at the same time. The two had an exchange about Ms. Cooper's unleashed dog, a violation of

park rules. Mr. Cooper recorded Ms. Cooper and her dog on his phone. *See* App. 11 (Compl. ¶ 1); App. 52.

In the video, Ms. Cooper asks him to stop recording, approaches him, points her finger at him, and again asks him to stop recording. Mr. Cooper responds, "Please don't come close to me," three times. ECF 27-1 at 3. (He does not stop recording.) As she continues to approach, she tells him that she is going to call the police and "tell them there's an African-American man threatening my life." App. 52; *see* ECF 27-1 at 3. Ms. Cooper follows through: she calls 911 and can be heard on the video telling the dispatcher repeatedly that an "African-American" man is threatening her. ECF 27-1 at 3. As soon as Ms. Cooper leashes her dog, Mr. Cooper thanks her and stops recording the encounter.

Later that day, Mr. Cooper's sister obtained a copy of the video. She published it on Twitter at 1:03 p.m. In a Tweet, she called Ms. Cooper a "Karen" for calling the police to report her brother even though Ms. Cooper was the only one of the two who was breaking the law. *Id.* at 2.

The video almost immediately went viral. App. 11 (Compl. ¶¶ 1–2). Social media exploded as millions of people watched and criticized Ms. Cooper for invoking Mr. Cooper's race to threaten police involvement

and then actually invoking Mr. Cooper's race while making frantic pleas to 911 for assistance. *See id.* For example, on the morning of May 26, New York City Mayor Bill de Blasio tweeted that Ms. Cooper's conduct was "racism, plain and simple"; on his view of the video, she "called the police BECAUSE he was a Black man. Even though she was the one breaking the rules. She decided he was the criminal and we know why." ECF 27-8 at 2.

The public's passioned response to the video was magnified when, in the evening of May 25, Minneapolis police killed George Floyd, an African-American man accused of using counterfeit money. App. 66. Social media users linked Ms. Cooper's incident with George Floyd's murder and other incidents of police responding brutally (and sometimes fatally) to complaints about African-American men.

By the end of the day on May 26, media outlets and broadcasters had published at least 100 national and international articles and segments about Ms. Cooper. App. 11 (Compl. ¶ 1); ECF 27-7. As Ms. Cooper admits, her "confrontation became international news as a racial flashpoint." App. 11 (Compl. ¶ 1).

Within hours of the video going viral, Ms. Cooper "sincerely and humbly apologize[d]" for her "unacceptable" conduct, which she described as

"not excusable" and "not defensible[.]" ECF 27-2 at 5–6. She claimed to understand why people might now think of her in a "lower light" and said that her conduct made her realize that there are "so many people in this country that don't have [the] luxury" of thinking about the police as a "protection agency." *Id.* She issued a statement through a public relations service, acknowledging that she "made false assumptions" and noting "the pain that misassumptions and insensitive statements about race cause[.]" *Id.* She stated that she never "imagined that [she] would be involved in the type of incident that occurred" in Central Park, and she asked Mr. Cooper to "accept [her] sincere apology." ECF 27-3.

## II. The company responds to the video.

Twitter sleuths almost immediately identified Ms. Cooper as a Franklin employee. A barrage of social media, including Tweets, drew the company into this global story. Late in the evening on May 25, the company issued the following statement on Twitter, the same platform where the video was originally published:

STATEMENT OF THE CASE                                    7



App. 13 (Compl. ¶ 8); ECF 27-8.

Though it was still a holiday (Memorial Day) and a time when pan-
demic-related protocols required nearly everyone to stay home, Appellees
began investigating the situation. Ms. Cooper admits that Appellees' em-
ployees watched the video and talked with her about the incident.
App. 17 (Compl. ¶ 36); App. 62; ECF 27-8. Ms. Cooper alleges that Appel-
lees did not obtain a recording of her 911 calls or look into a long-running
conflict in Central Park between birdwatchers like Mr. Cooper and
dogwalkers like Ms. Cooper. App. 18–19 (Compl. ¶¶ 44, 49).

On May 26, the company decided to terminate Cooper's at-will em-
ployment, effective immediately. App. 13 (Compl. ¶¶ 9–11); ECF 27-10.
The company issued the following statement on Twitter:



App. 13 (Compl. ¶¶ 9–11); ECF 27-10.

A week later, on June 2, 2020, Franklin's President and CEO, Jenny Johnson, was asked during an interview with Bloomberg about "the video of Amy Cooper" and the decision to terminate Ms. Cooper's employment. ECF 27-14. Ms. Johnson explained that Franklin's crisis-management team assembled over the Memorial Day holiday to "spend time getting the facts. Sometimes videos can get manipulated and so you have to make sure that you've reviewed all the facts. I think the facts were undisputed in this case, and we were able to make a quick decision." *Id.* After a separate question about the reactions of employees and clients to the decision to terminate Ms. Cooper's employment, Ms. Johnson explained, "We have to make those decisions based on our core values. We've always said we have a zero tolerance for any kind of racism, and so we felt that it was important to make that decision." *Id.*

Another month went by. On July 6, 2020, Ms. Johnson was asked again about "that Central Park incident in New York City" and the decision to terminate Ms. Cooper's employment, this time by Fortune Magazine. ECF 27-15 at 2. Ms. Johnson explained, "We espouse zero tolerance for racism. And zero tolerance means just that. And so when we looked at it and we concluded that this just was not consistent with our values as a firm, frankly we knew we needed to make a swift decision. There wasn't a lot else to debate once you've decided that that was the situation." *Id.*

## III. The district court dismisses Ms. Cooper's suit against Appellees.

One year after the incident, Ms. Cooper brought this action in the United States District Court for the Southern District of New York. Her Amended Complaint purports to state claims for defamation and defamation *per se*, race discrimination in violation of 42 U.S.C. § 1981, and race and sex discrimination under both the New York City Human Rights Law ("NYCHRL") and the New York State Human Rights Law ("NYSHRL"). The Amended Complaint also included claims for intentional infliction of emotional distress and negligence, which Ms. Cooper abandoned. App. 67.

Appellees moved to dismiss the Amended Complaint. App. 6. After briefing and argument, the district court granted the motion in full. App. 67. The court held that all three statements Ms. Cooper deemed defamatory—the May 26 Tweet, the June 2 Statement, and the July 6 Statement—are, as a matter of law, protected opinions. No reasonable reader or listener could read or hear the statements and think that Appellees based their comments on anything other than the widely circulated video of Ms. Cooper's interaction with Mr. Cooper. *See* App. 61–66. The court also held that Ms. Cooper's employment-discrimination claims fail as a matter of law because she pleaded no facts showing that Appellees either terminated her because of her race or sex or treated her differently than similarly situated non-White, male employees. App. 55–61.

# SUMMARY OF ARGUMENT

This Court should affirm the district court's order granting Appellees' motion to dismiss because Ms. Cooper has failed to state viable claims for defamation or employment discrimination.

## *Defamation*

Ms. Cooper admits that calling someone or something "racist" is "typically nonactionable opinion" under New York law. Still, she argues that statements Appellees made are actionable as *mixed* opinions because they supposedly imply to a reasonable reader or listener that Appellees "determined her to be a racist based upon an investigation which revealed facts undisclosed to [their] audience." Appellant's Opening Brief ("AOB") 20. The district court rightly rejected this argument.

First, as a matter of law, none of the statements implies the existence of undisclosed derogatory facts about Ms. Cooper. All of the statements are based on facts well known to the audience, *i.e.*, the viral video of Ms. Cooper's confrontation with Mr. Cooper in Central Park. Appellees made the statements in connection with a broader social dialogue about racism, spurred in part by the video, and each statement specifically refers to the Central Park incident. Insofar as any statement communicates anything derogatory about Ms. Cooper, it does so solely by reference to

public facts—her videotaped conduct in Central Park—and nothing more.

Second, Ms. Cooper's defamation claim fails because she does not plead actual malice as required under New York's Anti-SLAPP statute. Ms. Cooper argues that she need not plead actual malice because Appellees' statements supposedly do not concern a matter of public interest. But that argument fails under Ms. Cooper's own allegation that her confrontation with Mr. Cooper "became international news as a racial flashpoint." App. 11 (Compl. ¶ 1). Ms. Cooper also argues that she has pleaded actual malice because she alleged that Appellees' statements refer to investigations or reviews that never took place. But that argument fails because (1) Ms. Cooper's allegations confirm that statements about "investigating the situation" and "an internal review of the incident in Central Park yesterday" are true; and (2) Ms. Cooper does not plead facts tending to show that Appellees knew their statements were false or that Appellees maintained serious doubts about their truth.

## *Employment Discrimination*

Ms. Cooper's discrimination claims fail because she has not plausibly alleged facts to support an inference of race or sex discrimination. She asks the Court to infer from the Appellees' statements denouncing

"racism of any kind" that she was terminated because of her race. Appellees never mentioned Ms. Cooper's race, however, and this Court squarely holds that *racism* is not the same thing as *race*.

Ms. Cooper's comparator allegations do not salvage her discrimination claim. Comparators are not relevant unless they are similar to Ms. Cooper in "all material respects." Ms. Cooper tries to get around that demanding standard by arguing that she is challenging a purported "company-wide double standard," such that every Franklin employee is materially similar to her. That argument fundamentally fights against the "all material respects" standard; what's more, Ms. Cooper pleads no facts plausibly establishing a company-wide standard. Ms. Cooper's supposed comparators are different from her in every material way, including that they held different positions with the company and allegedly engaged in different misconduct. One cannot infer race or sex discrimination when an employer implements different discipline for different misconduct.

# ARGUMENT

## I. Standard of Review

The Court reviews a Rule 12(b)(6) order *de novo*. *See Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015).

## II. Ms. Cooper pleaded an invalid defamation claim.

To state a claim for defamation under New York law, Ms. Cooper must plead, "(1) a written defamatory factual statement [of and] concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or *per se* actionability." *Chau v. Lewis*, 771 F.3d 118, 126–27 (2d Cir. 2014) (citing *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) (applying New York law)). "Whether particular words are defamatory presents a legal question to be resolved by the court[s] in the first instance." *Celle*, 209 F.3d at 177 (alteration in original) (quoting *Aronson v. Wiersma*, 65 N.Y.2d 592, 593 (1985)). "[A] threshold issue for resolution by the court is whether the statement alleged to have caused plaintiff an injury is reasonably susceptible to the defamatory meaning imputed to it." *Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997) (internal citations omitted).

### A. Appellees' statements are nonactionable opinions, not actionable mixed opinions.

Because falsity is a "sine qua non" of a libel claim, and because "only assertions of fact are capable of being proven false," only statements of fact about a plaintiff are actionable in defamation. *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995). Statements of opinion about a plaintiff are never actionable, "no matter how unreasonable, extreme or erroneous these opinions might be." *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 380–81 (1977).

Whether a statement constitutes fact or opinion is a question of law. *Chau*, 771 F.3d at 128. "The dispositive inquiry ... is 'whether a reasonable [reader] could have concluded that [the statements were] conveying facts about the plaintiff.'" *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 152 (1993) (internal citations omitted). Viewing statements from the reasonable reader's perspective, courts consider the precise words used, the "full context of the communication in which the statement appears," and "the broader social context or setting surrounding the communication." *Chau*, 771 F.3d at 128–29; *see Brian*, 87 N.Y.2d at 51–52.

In her Amended Complaint, *see* App. 35–38 (Compl. ¶¶ 161–88), Ms. Cooper claimed that three of Appellees' statements defamed her[1]:

- *The May 26 Tweet*: "Following our internal review of the incident in Central Park yesterday, we have made the decision to terminate the employee involved, effective immediate. We do not tolerate racism of any kind at Franklin Templeton." ECF 27-10.

- *The June 2 Statement* (Ms. Johnson's answer to a reporter): "Sometimes videos can get manipulated and so you have to make sure that you've reviewed all the facts. I think the facts were undisputed in this case, and we were able to make a quick decision. … We have to make those decisions based on our core values. We've always said we have a zero tolerance for any kind of racism, and so we felt that it was important to make that decision." ECF 27-14.

---

1  Ms. Cooper's lead question presented suggests that the district court ignored or improperly analyzed the May 25 Tweet. AOB 2. This argument fails because (i) the district court in fact described the May 25 Tweet as part of the background relevant to this case, *see* App. 52; (ii) the Amended Complaint does not allege that the May 25 Tweet was defamatory, *see* App. 35–38 (Compl. ¶¶ 161–88); and (iii) even if the May 25 Tweet were allegedly defamatory, it would be subject to the same thorough analysis of context that the district court conducted as to the May 26 Tweet, *see* App. 63–66.

- *The July 6 Statement* (Ms. Johnson's answer to another reporter):
  "We espouse zero tolerance for racism. And zero tolerance means
  just that. And so when we looked at it and we concluded that this
  just was not consistent with our values as a firm, frankly we knew
  we needed to make a swift decision. There wasn't a lot else to de-
  bate once you've decided that that was the situation."[2] ECF 27-15.

Appellees never outright called Ms. Cooper a *racist*, and she does not
claim otherwise. Appellees spoke out against *racism* during a broad social
dialogue on racism and racial justice. Still, even if Appellees had called
Ms. Cooper or her actions racist, or even if a reader or listener could infer
that Appellees' condemnations of racism were actually calling Ms. Cooper
a racist, the statements would not be actionable. For, as Ms. Cooper con-
cedes, calling someone or something "racist" is "typically nonactionable
opinion" under New York law. AOB 20; *see* AOB 31 ("The Plaintiff has

---

[2]  Ms. Cooper's appellate brief does not mention the July 6 State-
ment, either by name or in substance. It appears she has aban-
doned her defamation claim based on the July 6 Statement. Still,
for completeness and context, we address it along with the other
two statements alleged to be defamatory in the Amended Com-
plaint.

never alleged that the Defendants could or should not have spoken out

against racial injustice … .").[3]

Ms. Cooper argues that the statements are actionable as *mixed* opin-

ions. *See* AOB 20–30. A mixed opinion is a statement of opinion that im-

plies it is based upon unstated or unknown defamatory facts. *See Chau*,

771 F.3d at 129; *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986). In

such a case, the opinion itself is not actionable; "what creates liability is

the implication that the speaker 'is privy to certain facts, unknown to his

general audience, which are supportive of the opinion and detrimental to

the person about whom the opinion is expressed[.]'" *Jaszai v. Christie's*,

279 A.D.2d 186, 190, 719 N.Y.S.2d 235, 238 (1st Dep't 2001) (quoting

*Rand v. New York Times Co.*, 75 A.D.2d 417, 422, 430 N.Y.S.2d 271, 274

(1st Dep't 1980)); *Steinhilber*, 68 N.Y.2d at 290 ("The actionable element

---

3  Characterizing someone as racist is pure opinion because the word
"racist" lacks a precise meaning and is incapable of being proven
true or false. Thus, "[c]ourts in New York have consistently held
that terms like 'racist' constitute nonactionable opinion." *Cum-
mings v. City of N.Y.*, 2020 WL 882335, at *20 (S.D.N.Y. Feb. 24,
2020) (citing cases), *aff'd*, 2022 WL 2166585 (2d Cir. June 16, 2022)
(summary order); *see, e.g.*, *Doe #1 v. Syracuse Univ.*, 468 F. Supp.
3d 489, 497 (N.D.N.Y. 2020) (no "reasonable reader" could con-
clude that statements describing students' words captured on
video as "extremely racist, anti-semitic, homophobic, sexist, and
hostile to people with disabilities" conveyed facts).

of a 'mixed opinion' is not the false opinion itself—it is the implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking."). In a mixed-opinion case, then, the focus is not the speaker's *opinion* of the plaintiff (which remains nonactionable), but the implied derogatory *facts* about the plaintiff (which are actionable inasmuch as expressed facts about the plaintiff may be actionable).

Ms. Cooper contends that Appellees' statements "imply[] they determined her to be a racist based upon an investigation which revealed facts undisclosed to [their] audience." AOB 20. This single contention undergirds Ms. Cooper's appeal of the district court's ruling on her defamation claim. *Accord* AOB 2 ("[A] reasonable reader or listener could understand the Defendants' statements to imply that Defendants possessed facts undisclosed or unknown to the reader or listener"); AOB 7 ("[T]he Defendants' multiple statements about Ms. Cooper … imply that Defendants held superior facts to the general public."); AOB 9 ("[T]he public statements published by the Defendants to millions of people imply[] that it [sic] had performed a legitimate investigation into its [sic] employee."); AOB 13 ("Ms. Johnson again implied that the Defendants possessed information about the Plaintiff which the public did not have."); AOB 28

("The Defendants could have refrained from implying it [sic] had additional facts … ."). Ms. Cooper's argument lacks merit. The district court was correct to hold that Appellees' statements do not, as a matter of law, imply "that the opinions contained therein rested on facts undisclosed to the audience." App. 65.

### 1. The statements are based on facts known to the audience.

Statements are actionable as mixed opinions only insofar as they imply that they are based on unknown, nonpublic information about the plaintiff. Comments on known, public events are pure opinion. *See Rand*, 75 A.D.2d at 422, 430 N.Y.S.2d at 274; *see also* Robert D. Sack, *Sack on Defamation*, § 4:4:2 (4th ed. 2012); *Restatement (Second) of Torts* § 566, cmt. c (1977) ("A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation[.]").

Indisputably, Appellees' statements were based on known, public facts. Because the May 26 Tweet and the July 6 Statement do not even mention Ms. Cooper by name, readers and listeners could connect the statements to her only if they had independent knowledge of public facts—*e.g.*, the widely seen video of Ms. Cooper's encounter with Mr.

Cooper in Central Park on May 25, 2020 and the public discourse and media coverage that followed. Similarly, the June 2 Statement was prompted by a reporter who invoked the same public facts—"the video of Amy Cooper, the White employee at Franklin Templeton at the time calling police and accusing the African American man of threatening her and her dog." ECF 27-14. Thus, the district court correctly held that the "contents of the viral video, as well as the dialogue surrounding it both in the media and on social media, were already matters of public knowledge when Defendants' May 26 tweet was posted" (and, logically, still matters of public knowledge at the time of Appellees' June 2 and July 6 Statements). App. 66.

That Appellees' statements were based on matters of public knowledge distinguishes this case from *Afftrex, Ltd. v. General Electric Co.*, where the defendant allegedly defamed the plaintiff by saying that he "was fired from his job" because he was "an evil man." 161 A.D.2d 855, 856, 555 N.Y.S.2d 903, 905 (3d Dep't 1990). There, the Appellate Division determined the statement was mixed opinion because the audience had no public knowledge of the events that prompted the defendant to conclude that the plaintiff was "an evil man" or what led to plaintiff's termination. Here, by contrast, the basis for Appellees' statements—the viral

video of Ms. Cooper—had been widely disseminated on Twitter and elsewhere and had become "international news." App. 11 (Compl. ¶ 1).

### 2. The statements do not imply
### they are based on undisclosed facts.

Given that the statements were based on known, public facts, they could be mixed opinions only if Appellees expressed that they possessed additional unknown, nonpublic facts about Ms. Cooper and that Appellees considered those facts in forming their legally protected conclusion. Considering the "full context of the communication in which the statement appears" and "the broader social context or setting surrounding the statement," *Chau*, 771 F.3d at 128–29, no reasonable reader or listener of the statements would have understood that Appellees based their opinions on undisclosed facts about Ms. Cooper, let alone undisclosed facts that were "a gross distortion or misrepresentation." *Jaszai*, 279 A.D.2d at 190, 719 N.Y.S.2d at 238.

The May 26 Tweet states that Appellees had conducted an "internal review of the incident in Central Park yesterday." App. 13 (Compl. ¶¶ 9–11); ECF 27-10. The object of that internal review is plainly stated—"*the incident in Central Park yesterday*"—and the statement does not imply that Appellees based their decision on anything else. Appellees did not

state or suggest, for example, that they reviewed information they might have obtained as her employer (such as details about her job performance or workplace encounters), her character, or any other encounters outside of the office that she may have been involved in.

Context confirms that the May 26 Tweet means what it says. The day-earlier May 25 Tweet similarly mentions only "an incident involving an employee on May 25th." App. 13 (Compl. ¶ 8); ECF 27-8. Appellees' statement in the May 25 Tweet—that they were "investigating the situation"—connotes that Appellees were considering the same facts the public could access, for the object of what they were investigating was "the situation" (that is, the "incident"), not Ms. Cooper's nonpublic background, private conscience, or personal beliefs. The definite article "the" connotes a single "situation"—only the incident in Central Park. Thus, the May 25 and 26 Tweets, read side-by-side, do not suggest that Appellees relied on any nonpublic information about Ms. Cooper.[4]

---

[4]  As a matter of law, Appellees' statements postdating the May 26 Tweet (including statements to reporters on June 2, 2020, July 6, 2020, and July 15, 2021, *see* AOB 12–14) are not context for the May 26 Tweet because chronologically later statements cannot inform or change the meaning of an earlier statement. *See Trustco Bank of New York v. Cap. Newspaper Div. of Hearst Corp.*, 213

(footnote continued on next page)

The timing and circumstances of the May 26 Tweet confirm that it cannot reasonably be understood to suggest that Appellees conducted a wide-reaching investigation that uncovered nonpublic derogatory facts about Ms. Cooper. Ms. Cooper's confrontation with Mr. Cooper occurred on Memorial Day during the COVID-19 lockdowns. Appellees' May 25 Tweet acknowledging the incident and the May 26 Tweet were separated by less than 24 hours. No reasonable reader of the May 26 Tweet would infer that mere use of words like "investigating the situation" or "internal review" suggested a large-scale mobilization of resources that uncovered nonpublic facts about Ms. Cooper, particularly when the review was completed in less than a day and was limited by the holiday weekend and pandemic restrictions.

The June 2 Statement similarly communicates that Appellees had relied on public information. After the interviewer summarized the viral video, Ms. Johnson explained that Franklin Templeton's team convened on short notice, on a holiday, during the pandemic, and "reviewed all the

---

A.D.2d 940, 943, 624 N.Y.S.2d 291, 294 (3d Dep't 1995) ("[A] reasonable reader obviously could not have been aware of Flanigan's subsequent statements when the allegedly defamatory statement was published.").

facts" *in order to rule out that the video had been "manipulated."* ECF 27-14. A reasonable reader would not have understood that to include nonpublic information concerning Ms. Cooper. Indeed, within hours of the incident, Ms. Cooper publicly apologized for her conduct, *see* pp. 5–6, *supra*, confirming Ms. Johnson's observation that "the facts" *about the video* "were undisputed in this case."

Finally, the July 6 Statement does not imply any nonpublic information about Ms. Cooper. After the interviewer asked about "that Central Park incident in New York City," Ms. Johnson mentioned only the incident as depicted in the video: "we looked at *it* and we concluded that *this* just was not consistent with our values as a firm." ECF 27-15 at 2 (emphases added). The singular pronouns "it" and "this" do not imply that Appellees relied on additional nonpublic information.

### 3. Broader social context confirms the statements were not based on undisclosed, defamatory facts.

Appellees made the statements Ms. Cooper challenges while people across the nation became focused on the discriminatory and sometimes violent reactions of some police officers and departments to complaints against African-American men. The viral video that triggered Appellees' statements itself became "international news as a racial flashpoint."

App. 11 (Compl. ¶ 1). That same day (May 25, 2020), Minneapolis police killed a African-American man, George Floyd. App. 66.

Against this backdrop, a reasonable reader or listener would not have assumed that Appellees fired Ms. Cooper because of conduct that only Franklin Templeton knew about. Based solely on public information, much of which was caught on video, many people—from reporters to politicians to ordinary citizens—were drawing conclusions and opining that Ms. Cooper "called the police BECAUSE [Mr. Cooper] was a Black man." ECF 27-9. Given that speakers entirely unconnected with Ms. Cooper (or Appellees) were drawing the same conclusions that Ms. Cooper alleges Appellees drew, a reasonable observer would not assume that Appellees' statements were "grounded in undisclosed and superior knowledge." AOB 21.[5]

---

[5]  To demonstrate the "broader social context" of the challenged statements, Appellees submitted news articles and Tweets published during the public dialogue precipitated by Ms. Cooper's encounter. *See, e.g.*, ECF 27-4, 27-5, 27-6, 27-7, 27-9. The district court could properly take judicial notice of Appellees' submissions. *See e.g., In re Merrill Lynch & Co., Inc. Rsch. Reps. Secs. Litig.*, 289 F. Supp. 2d 429, 433 n.3 (S.D.N.Y. 2003) (court may take judicial notice of newspaper articles for fact of their publication on a motion to dismiss). Ms. Cooper's appellate attack on those submissions—mischaracterizing them as evidence Appellees

(footnote continued on next page)

### *4. Ms. Cooper's arguments challenging Appellees' review do not plausibly allege actionable mixed opinion*

Ms. Cooper argues that Appellees' statements are mixed opinions because Appellees supposedly "performed *no* investigation, they conducted *no* internal review, they held *no* undisputed facts, and endeavored *no* due diligence." AOB 6 (emphases added). Throughout her opening brief, in fact, Ms. Cooper repeatedly insists that Appellees did nothing whatsoever before terminating her and making the allegedly defamatory statements. *Accord* AOB 14 ("The Defendants performed no investigation into the May 25, 2020 incident in Central Park involving Plaintiff other than read social media"); AOB 20 ("Defendants knew no such investigation ever took place and that they possessed no such facts."); AOB 28 ("[T]here was no investigation, internal review, review of any facts or due diligence by the Defendants.").

The district court correctly held that Ms. Cooper's own factual allegations and concessions during oral argument below defeat her argument that Appellees did nothing whatsoever. Ms. Cooper admits that Appellees' employees watched the viral video of her conduct in Central Park

---

proffered to show what was considered in connection with her termination, *see* AOB 29–30—is entirely unfounded.

and spoke with her about the incident. App. 17 (Compl. ¶ 36); App. 62;
ECF 27-8. Ms. Cooper "may take issue with the sufficiency of [Appellees']
investigation into the incident, but she has not plausibly alleged that no
investigation was conducted at all." App. 64. Ignoring her own admis-
sions, Ms. Cooper argues that the district court should have waited for
Appellees to submit evidence detailing the scope of their internal review,
*see* AOB 29–30, but it is black letter law that defendants can—indeed,
*must*—attack the sufficiency of a complaint without extrinsic evidence.
*See* Fed. R. Civ. P. 12(d).

Moreover, as a matter of law, Ms. Cooper's mixed-opinion claims
would be no stronger even if Appellees had done "no investigation," as
she accuses. To hold Appellees liable for defamatory mixed opinions,
Ms. Cooper ultimately must establish (1) that Appellees' statements im-
plied defamatory facts about Ms. Cooper that reasonable readers did not
know, and (2) that "the implied facts" about Ms. Cooper are "a gross dis-
tortion or misrepresentation." *Jaszai*, 279 A.D.2d at 190, 719 N.Y.S.2d at
238. In other words, what matters in a mixed-opinion case is whether the
defendants implied false facts *about the plaintiff*. *See* pp. 18–19, *supra*.
If Appellees had lied about their internal review, it would, at most, be a
false fact *about Appellees*. The truth or falsity of Appellees' statements

about their own conduct is legally irrelevant because it does not relate to what reasonable readers understood from Appellees' statements or to whether any implied facts about Ms. Cooper were false and defamatory—the two inquiries in every mixed-opinion case.

## B.    Ms. Cooper fails to allege actual malice.

Although the district court did not address actual malice (because the court dismissed Ms. Cooper's improper attempt to hold Appellees liable for statements of opinion), Ms. Cooper takes on Appellees' lower-court objection that she has failed to allege actual malice. *See* AOB 30–34. If the Court determines that Appellees' statements are mixed opinions, the Court could and should still affirm the dismissal on actual-malice grounds.

Under New York's Anti-SLAPP statute, for a defamation claim based upon "any communication in a place open to the public or a public forum in connection with an issue of public interest" or "lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest," the plaintiff must:

> establish[] by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether

> it was false, where the truth or falsity of such communication
> is material to the cause of action at issue.

N.Y. Civil Rights Law § 76-a(2). The Anti-SLAPP statute requires, as a matter of substantive state law, that a plaintiff allege and prove actual malice in a wide range of defamation claims.

Ms. Cooper first contends that the Anti-SLAPP statute does not shield the statements she challenges because Appellees' statements were "unlawful conduct." *See* AOB 30–31. This argument does not avoid the Anti-SLAPP statute for two reasons.

First, the Anti-SLAPP statute applies to "any communication in a place open to the public or a public forum in connection with an issue of public interest." N.Y. Civil Rights Law § 76-a(2). Plainly, Appellees' statements were in public fora (Twitter, Bloomberg, and Fortune) and concerned an issue of public interest (racial injustice). *See* App. 11 (Compl. ¶ 1) (admitting that Ms. Cooper's confrontation with Mr. Cooper was "international news as a racial flashpoint"); AOB 31 (conceding that "racial injustice" is a matter of public interest and that Appellees' rejections of racism are "non-defamatory"). Those facts, standing alone, are enough to trigger application of the Anti-SLAPP statute.

Second, Appellees' statements were not "unlawful conduct." Ms. Cooper cites no authority treating as "unlawful" statements related to terminations of employment, and it would be inappropriate to do so here, when Ms. Cooper has failed to allege plausibly that her termination was unlawful, *see* pp. 33–42, *infra*. Ms. Cooper therefore must plausibly allege actual malice. *See Biro*, 807 F.3d at 545.

A statement is made with actual malice if it is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). Reckless disregard of the truth is a term of art requiring "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication" and yet published with such doubts. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *see Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989). Actual malice "should not be confused with the concept of malice as an evil motive or a motive arising from spite or ill will." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991); *see also Biro*, 807 F.3d at 546. It focuses not "on the defendant's attitude toward the plaintiff," but rather "on the defendant's attitude toward the truth." *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 99 (2d Cir. 2000).

In the proceedings below, Ms. Cooper refrained from arguing that the Appellees acted with actual malice in accusing her of racism. *See* ECF 31 at 28 ("Actual malice does not require the Plaintiff to show that Defendants knew she was not racist to overcome this motion to dismiss."). Ms. Cooper's entire argument about actual malice was, and still is, that Appellees knowingly lied when they "published statements that they had performed an investigation, conducted an internal review, held undisputed facts, and performed its [sic] due diligence when they knew no such analysis had been performed." AOB 34. Her argument fails for two reasons.

First, as explained above, Ms. Cooper's factual allegations and concessions confirm that Appellees' statements that they reviewed the incident in Central Park are true. *See* pp. 27–28, *supra*; *see also* App. 63. Ms. Cooper argues that Appellees' review was insufficient—not deep enough, not thorough enough—but even if Appellees' review were in some sense insufficient, it would not demonstrate actual malice. It is well-established that a total failure to investigate, "even when a reasonably prudent person would have done so," does not demonstrate actual malice. *Harte-Hanks*, 491 U.S. at 688, 692; *see St. Amant*, 390 U.S. at 731; *see also Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir.

2013) ("[F]ailure to investigate is precisely what the Supreme Court has said is insufficient to establish reckless disregard for the truth.").

Second, Ms. Cooper pleaded no factual allegations that even tend to show that Appellees knew their statements were false or that Appellees entertained serious, subjective doubts about their truth. Ms. Cooper does not allege, for example, that anyone told Appellees that the video of the incident in Central Park was fabricated. And her bare allegations that Appellees "knew that [the statements] were false," App. 35–36, 38 (Compl. ¶¶ 164–66, 182–84), are conclusory allegations and thus "inadequate to state a plausible claim for relief," *Biro*, 807 F.3d at 547.

## III. Ms. Cooper failed to plead discrimination claims.

Ms. Cooper's employment discrimination claims fail as a matter of law because she did not plausibly plead facts that support an inference of discrimination. Under all of the laws she invokes, even the more lenient NYCHRL, Ms. Cooper "bears the burden of showing that the conduct is caused by a discriminatory motive." *Bliss v. MXK Rest. Corp.*, 220 F. Supp. 3d 419, 424 (S.D.N.Y. 2016) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013)). She must plead facts that connect her termination to her race or sex—that

she was terminated "because of" her protected category. *Johnson v. Andy Frain Servs., Inc.*, 638 F. App'x 68, 71 (2d Cir. 2016).

The district court's dismissal of Ms. Cooper's discrimination claims properly applied settled law. Her claims are based on conclusory, sensationalized, and speculative allegations, and her effort to compare herself with three totally distinct individuals lacks merit.

### A.    Racism is not race.

Ms. Cooper only cursorily objects to the district court's holding that Appellees' public statements opposing racism do not support an inference that Appellees fired her because of her race. *See* App. 56 ("This argument merits little attention."). In Ms. Cooper's view, Appellees "implicated the race of their employee with each of its [sic] communications to the public, by repeatedly connecting its stated stance against racism with their termination of the Plaintiff." AOB 41. That is demonstrably false. None of Appellees' statements hints at Ms. Cooper's race or in any way implies that Appellees treated her differently because of her race.

In each statement, Appellees plainly expressed their intolerance of "racism." "Racism is not race," and statements condemning racism "do[] not indicate that the object of the statement is being rejected *because of*

his race." *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013). What's more, Ms. Cooper admits that Appellees disapproved of "racism of *any kind*" without limitation. App. 13 (Compl. ¶ 8); ECF 27-8 (emphasis added). She does not allege any facts suggesting, for example, that Appellees treat racist conduct by its employees differently based on the race of the employee involved. *See* App. 60 ("Without more factual support, her claims that Defendants would have performed a more thorough investigation but for her race and gender are mere conclusory assertions not entitled to the presumption of truth at this stage." (internal citation omitted)). Accordingly, the district court correctly rejected Ms. Cooper's argument that she would not have been "terminated without an investigation but-for her race." AOB 41.

## B. The individuals Ms. Cooper compares herself with are not similarly situated to her.

Comparator allegations—*i.e.*, allegations about how an employer treated other employees differently—may establish an inference of discrimination only when the plaintiff and other employees are similarly situated "*in all material respects.*" *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (emphasis added). Which "respects" are "material" varies from case to case, as Ms. Cooper admits. *See* AOB 43. At a

minimum, the plaintiff and her comparators need to be "subject to the same workplace standards" and engaged in conduct of "comparable seriousness." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). Ms. Cooper also admits that "the standard for comparators is rather stringent." AOB 46 (quoting *Chen-Oster v. Goldman, Sachs & Co.*, 2019 WL 3294145, at *2 (S.D.N.Y. June 7, 2019)).

Ms. Cooper alleged the following three males (one of whom is non-White) are comparators:

1. *Vivek Kudva* worked in India as head of Asia Pacific distribution. Ms. Cooper speculates that he is the unnamed person Ms. Johnson referenced in a Yahoo! Finance interview and that Appellees "did not discipline Kudva in any meaningful way" for alleged personal trading misconduct in India. App. 16, 27 (Compl. ¶¶ 28–31, 99).

2. *"C.K."* is a "Financial Institutions" executive who worked in an undisclosed location. Ms. Cooper speculatively alleges, among other things, that he was not terminated after someone complained that he "committed acts of sexual harassment in the workplace." App. 28–30 (Compl. ¶¶ 109, 125, 127).

3. *Chuck Johnson* was a *non-employee* former company director. Ms. Cooper alleges he was involved in a domestic incident more

than a decade before his appointment to the board of directors. App. 27–28 (Compl. ¶¶ 104–08).

The district court correctly held that these three individuals are not similarly situated to Ms. Cooper "in all material respects." App. 57. Indeed, Ms. Cooper and the supposed comparators were not similar in *any* material respect. Accordingly, Ms. Cooper's arguments, both that Appellees handled her situation differently than theirs and that Appellees terminated her but not them, fail as a matter of law. *See* AOB 45 (arguing that her comparators show that "males … receive no scrutiny or discipline for alleged wrongdoing" while she, "a female … instantly received the ultimate punishment").

Ms. Cooper largely ignores the district court's observation that her "position, seniority, job responsibilities, business unit, performance, length of experience, [and] even geography" were all obviously different than those of the comparators. App. 57. Of all the differences the district court identified, the only one Ms. Cooper addresses now is her different, lower-level position: she admits that she and the comparators "did not hold identical positions," and she argues that the difference is immaterial because she is challenging an alleged "company-wide double standard between males who receive no scrutiny or discipline for alleged wrongdoing,

and a female who instantly received the ultimate punishment." AOB 44–45. But Ms. Cooper alleges no facts to substantiate the existence of such a company-wide policy. The only support Ms. Cooper offers for a "company-wide double standard" is the supposed difference between how she and the comparators were treated, but that is insufficient because the comparators are not similarly situated in all material respects. *See* App. 58 ("Plaintiff has thus failed to demonstrate that her selected comparators were subject to the same performance evaluation and discipline standards.") (cleaned up). The district court correctly held that it is not race or sex discrimination to discipline employees differently when they hold different positions. *See* App. 59–60 (finding "no case ... in which a court found that mutual employment by the same company—without more—is sufficient to render two individuals 'similarly situated'").[6]

---

[6] *See, e.g., Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) ("[T]o the extent [the plaintiff] attempts to rely on adverse employment actions taken against other employees who worked for different agencies and who had different jobs, the district court correctly concluded that adverse actions taken against employees who are not similarly situated cannot establish an inference of discrimination"); *Anderson v. N.Y. City Dep't of Fin.*, 2021 WL 168476, at *2 (S.D.N.Y. Jan. 19, 2021) (dismissing claims when plaintiff "pled nothing about [his comparators'] positions and whether the same policies ... should have been applicable to them

(footnote continued on next page)

Equally fatal to Ms. Cooper's discrimination claims is her failure to plead that she and her comparators engaged in comparable conduct. The district court correctly concluded that the comparators' alleged misconduct was "simply too different in kind to be comparable to her conduct in this case." App. 59. Ms. Cooper was terminated after a viral video captured her threatening to call the police and make a false report based on another person's race and following through on that threat. In contrast, Ms. Cooper's vague and speculative allegations about the comparators have *nothing* to do with racism. She does not allege, for instance, that any comparator took any actions based on another person's race. Rather, she alleges conclusorily that the comparators engaged in "sexual harassment, domestic battery, corporate misconduct, and fraud," AOB 38, and surmises that antidiscrimination laws require employers to respond to such problems the same way they respond to employees who take actions based on another person's race. Ms. Cooper is wrong. The antidiscrimination laws she invokes do not require such an approach for obvious

---

in those positions"); *Williams v. Metro-N. R.R.*, 2020 WL 1489832, at *8 (S.D.N.Y. Mar. 27, 2020) ("The difference in work locations, with different work environments and different supervisors making disciplinary decisions, undermines any claim to being 'similarly situated'") (citation omitted).

Case 22-2763, Document 51, 01/23/2023, 3457046, Page46 of 51

reasons. An employer does not discriminate on the basis of race or sex when it chooses to respond to an employee's "racial flashpoint" misconduct "less well" than it responds to employees accused of other types of misconduct. AOB 38.

Ms. Cooper argues that Appellees publicly touted someone, who she speculates might be Mr. Kudva, as a comparator to her and that, therefore, the district court had to accept him as such. *See* AOB 39, 45. Ms. Cooper bases this argument on a demonstrably false understanding of a July 2021 interview Ms. Johnson did with Yahoo! Finance. *See* AOB 14. Ms. Johnson did not claim a company-wide policy against "rely[ing] on social media to make personnel decisions in high-profile cases" or otherwise admit that Appellees treated Ms. Cooper and Mr. Kudva differently. *Id.* Ms. Johnson did not even refer to Mr. Kudva. In that interview, Ms. Johnson summarized her conversation with others over "an issue recently," stating that "social media doesn't have the facts right *on this particular situation.*" *Id.* (emphasis added). And Ms. Johnson's remarks made clear that she did not find the situation she was referencing to be at all similar to Ms. Cooper's. AOB 45. Ms. Johnson's remarks generally expressed confidence in Appellees' "due diligence" and "the process to make our evaluations, our decisions." App. 16 (Compl. ¶ 32).

Taken to its logical conclusion, Ms. Cooper's theory is that *all* Franklin Templeton employees (totaling several thousand across the globe) are similarly situated to her "in all material respects" simply by virtue of their mutual employment (or association) with any entity under the broad Franklin Templeton umbrella organization and that any different discipline, even for dissimilar conduct, experienced by any male employee anywhere in the world raises an inference of sex discrimination. That absurd conclusion is an attack on this Court's longstanding requirement that, in order to raise an inference of discrimination, a plaintiff and her comparators must have been "subject to the same workplace standards" and must have engaged in conduct of "comparable seriousness." *Graham*, 230 F.3d at 40.

In the end, Ms. Cooper insists that the Court should reverse simply because "[i]ssues regarding the appropriateness of a comparator are typically addressed at the summary judgment stage." AOB 42. If that is typical, it is because plaintiffs typically plead facts of a *bona fide* comparator. Ms. Cooper, however, did not, and there are many examples of courts dismissing employment discrimination claims because the alleged comparators were not similarly situated. *See Marcus v. Leviton Mfg. Co., Inc.*, 661 F. App'x 29, 32 (2d Cir. 2016) (affirming dismissal of

discrimination claims and explaining "the mere allegation that two other employees—one younger and one similar in age—used profanity without being fired does not give rise to even a minimal inference of age discrimination" without "any information as to whether the[] employees were otherwise similarly situated or the specifics of their conduct"); *De La Pena v. Metro. Life Ins. Co.*, 953 F. Supp. 2d 393, 414 (E.D.N.Y. 2013) (dismissing claims where the complaint failed to proffer sufficient facts regarding comparators to support the contention the comparators were similarly situated to the plaintiffs), *aff'd*, 552 F. App'x 98 (2d Cir. 2014); *see also Johnson*, 638 F. App'x at 71 (summary order) (affirming dismissal of, *inter alia*, § 1981, NYSHRL and NYCHRL race, sex, and national origin discrimination claims for failure to raise an inference of discrimination and explaining that a "plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself").

# CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

/s Bryan Killian

Bryan Killian
Grace E. Speights
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
T: 202-739-3000
bryan.killian@morganlewis.com
grace.speights@morganlewis.com

January 23, 2023

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g)(1), I certify that Appellees' Brief meets the type-volume limitations of Rule 32(a)(7)(B) and Circuit Rule 32.1(a)(4)(B) because it contains 8,419 words.

/s Bryan Killian

# CERTIFICATE OF SERVICE

I certify that, on this January 23, 2023, I electronically filed Appellees' Brief with the Clerk for the United States Court of Appeals for the Second Circuit. I used the Court's CM/ECF system, which serves registered CM/ECF users. All attorneys in this case are registered CM/ECF users and were served accordingly.

/s Bryan Killian